Revised August 17, 1998

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 97-50298
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee


VERSUS


ALVARO NARVIZ-GUERRA and LARRY AUSTIN GRANT,


Defendants-Appellants.

_____

Appeals from the United States District Court
For the Western District of Texas
July 28, 1998
_____

Before  DUHÉ, BENAVIDES, and STEWART, Circuit Judges.

JOHN M. DUHÉ, JR., Circuit Judge:

Defendants Alvaro Narviz-Guerra ("Narviz") and  Larry Grant ("Grant") were tried and convicted for possession of marijuana with the intent to distribute, conspiracy to possess marijuana, conspiracy to launder monetary instruments, and engaging in a continuing criminal enterprise.  Narviz appeals his conviction arguing insufficiency of the evidence, lack of verdict unanimity, improper admission of hearsay, and double jeopardy.  Second, he

appeals his sentence arguing that the presentence report was unreliable. Third, he appeals the forfeiture of his truck contending that it was improperly forfeited under 18 U.S.C. § 853(a)(2). Grant appeals his conviction arguing that his right to a speedy trial was violated, that there was insufficient evidence to convict him of money laundering, and that the trial court failed to give a compensated witness instruction. He also appeals his sentence contending that the amount of marijuana for which he was held responsible was not reasonably foreseeable. We vacate Narviz's conviction for conspiracy to possess with the intent to distribute on the grounds it violates double jeopardy. We affirm Narviz's other convictions and his sentence. We also affirm Grant's conviction and sentence.

## BACKGROUND

In early 1991, Narviz bought Las Moras Ranch, a 534 acre ranch which had previously been used to breed cattle and harvest pecans and was bordered by the Rio Grande and Las Moras Creek. Narviz made Grant foreman. Within six months, the ranch had deteriorated significantly, and Narviz was running so far behind on payments that the seller forced Grant off the ranch. Narviz, however, negotiated a settlement, and Grant returned to the ranch about a year later.

Narviz and Grant used the ranch to smuggle marijuana from Mexico into Texas and then moved it from the ranch to distributors

2

for shipping throughout Texas.  In November 1993, Ricardo Perez ("Perez"), a fugitive who knew Narviz from past trafficking and still maintained contacts with American distributors, joined Narviz's organization.  Perez contacted Narviz after meeting a pilot flying loads of marijuana to Narviz.  They arranged the marijuana transactions so that Narviz remained unknown to Perez's associates.  Narviz set up the deliveries by phone from Mexico while Perez directed the receipt, storage, and distribution in Texas.  Over the next year and a half, between 12 and 18 loads of marijuana, weighing 200-600 pounds, were delivered to Perez's associates.

In June 1995, the Drug Enforcement Agency ("DEA") searched Narviz's ranch which they found in poor condition.  The fences and pecan trees had deteriorated.  The two houses on the ranch were unlocked; they contained little furniture, had broken windows and trash strewn about.  Moreover, the agents found two bales of marijuana, marijuana residue, inner tubes, and burlap or fiberglass bags that had contained marijuana.

In July, the DEA arrested one of Perez's associates, Tony Hall ("Hall"), who began cooperating in the investigation.  Hall set up a controlled buy with another associate, Craig Hillis ("Hillis").  Hillis, too, was arrested and began cooperating.  Hillis consented to a search of his stash house where agents found about 100 pounds of a 400 pound load that had been delivered between August and October of 1994.

On September 22, 1995, Perez's wife contacted Hall and said that she wanted approval to put Narviz in touch with Hall. Three days later, Grant drove Narviz to a Houston restaurant where they met with Hall and an undercover agent to discuss the buying and selling of additional loads. On November 30, Narviz, Hall, and Grant met again at another restaurant near Houston. As Narviz and Grant left the restaurant, they were arrested. Narviz was tried and convicted of conspiracy to possess marijuana with the intent to distribute, six counts of possession with intent to distribute, conspiracy to launder monetary instruments, and engaging in a continuing criminal enterprise. He was sentenced to 360 months in prison. Grant was tried and convicted of conspiracy to possess marijuana, two counts of possession with intent to distribute and one count of conspiracy to launder monetary instruments. He was sentenced to 188 months. Both appeal their conviction and sentences.

## ANALYSIS

### A. NARVIZ

#### 1. DOUBLE JEOPARDY

Narviz argues, and the government concedes, that his conviction on Count One of the indictment must be vacated. Count One charged Narviz with conspiracy to possess marijuana with the intent to distribute. Because conspiracy is a lesser included offense of the continuing criminal enterprise charged in Count

4

Three, his conviction on Count One violates double jeopardy. See Rutledge v. United States, 517 U.S. 292, 307 (1996); United States v. Dixon, 132 F.3d 192, 196 (5th Cir. 1997). Though we vacate Narviz's conviction on Count One, we do not remand for resentencing. Where it is clear that the drug conspiracy conviction did not lead the district court to impose a harsher sentence for engaging in a continuing criminal enterprise ("CCE"), there is no need to remand. United States v. Dixon, 132 F.3d at 196. Here, Narviz was sentenced to 360 months for Counts One and Three with the terms to run concurrently; thus, the sentence for the CCE is no harsher than it would have been without the drug conspiracy conviction.

**2. VERDICT UNANIMITY**

Because Narviz's trial counsel did not object to the failure to give a specific instruction requiring unanimity, this Court reviews for plain error. United States v. Harris, 104 F.3d 1465, 1471 (5th Cir.), cert. denied, 118 S. Ct. 103 (1997).

Narviz points out that he was charged with laundering monetary instruments under 19 U.S.C. §§ 1956(a)(2)(A) and (h) which proscribes transporting, transmitting, and transferring a monetary instrument or funds from or to the United States with the intent to carry on specified unlawful activity. When the judge instructed the jury, he told them that the prosecution had to prove beyond a reasonable doubt that two or more agreed to launder money either by

5

sending it from or to the United States. Narviz argues that this instruction was error because it is unclear whether Narviz was convicted of laundering money by sending it to or from the United States. He contends that our holding in United States v. Gipson, 553 F.2d 453 (5th Cir. 1977) requires a specific unanimity instruction when a jury could find a defendant guilty on a single count under multiple theories of liability.

While Narviz accurately summarizes our holding in that case, Gipson simply does not apply here because Narviz was convicted of conspiracy and not the actual offense. Rather, we look to our holding United States v. Dillman, 15 F.3d 384, 391-92 (5th Cir. 1994) which said that where an indictment alleged conspiracy to commit several offenses, the district court did not err in giving a general unanimity instruction. The Dillman court explained that when twelve jurors agree that a defendant agreed to commit a crime, all jurors do not have to agree about which offense the defendant personally intended to commit. There need be only one conspiracy to encompass the particular charged offense. Id. at 392. Here, the facts fall within Dillman's reasoning. The judge gave a general unanimity charge, and the conspiracy to launder money encompasses moving money both to and from the United States. Thus, we cannot say that the district court plainly erred in failing to give a specific unanimity instruction.

### 3. INSUFFICIENT EVIDENCE

6

Counts Four and Seven allege respectively that on or about October 1994 and July 20, 1995, Narviz unlawfully and knowingly possessed marijuana with intent to distribute. Narviz argues that the record does not show that the government proved any of the specified conduct. He contends that the government produced no evidence that Narviz possessed any marijuana on those specific dates. Rather, the government produced witnesses who testified to the loads that they, as co-conspirators, handled over the years.

This Court reviews the evidence in the light most favorable to, and with all reasonable inferences drawn in support of, the verdict. United States v. Thompson, 130 F.3d 676, 688 (5th Cir. 1997). We must affirm Narviz's conviction under these counts if any rational trier of fact could have found the essential elements beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).

To convict for possession with intent to distribute, the government must prove (1) knowing, (2) possession, (3) with intent to distribute. United States v. Lopez, 74 F.3d 575, 577 (5th Cir.), cert. denied 116 S. Ct. 1867 (1996). Possession may be joint. United States v. Skipper, 74 F.3d 608, 611 (5th Cir. 1996). A party to a conspiracy may be held responsible for a substantive offense that a co-conspirator commits in furtherance of the conspiracy even if the party did not participate in or have any knowledge of that offense. Pinkerton v. United States, 328 U.S. 640, 647 (1946). Thus, once the conspiracy and the defendant's

7

knowing participation therein is proved beyond a reasonable doubt, a defendant is guilty of the substantive acts his partners committed in furtherance of the conspiracy. United States v. Garcia, 917 F.2d 1370, 1377 (5th Cir. 1990). Here, the evidence is sufficient under these theories.

DEA agents searched a stash house Craig Hillis used and seized 97 pounds of marijuana from a freezer in the garage. The marijuana was part of a load that Narviz supplied and had delivered to Hillis between August and October 1994. Hillis, as a co-conspirator, continuously possessed the 97 pounds. Thus, Narviz's conviction on Count Four stands.

For the same reasons, Narviz's conviction on Count Seven also stands. At trial, the government showed that DEA agents searched another stash house and seized 183 pounds of marijuana on July 20, 1995. On July 14, Tony Hall had received 300 pounds of marijuana that Narviz had sent through a co-defendant and took it to that same stash house. We hold, therefore, that the jury had sufficient evidence to convict Narviz of possessing marijuana on or about July 20, 1995.

## 4. HEARSAY TESTIMONY

We review a district court's evidentiary rulings for abuse of discretion. United States v. Parks, 68 F.3d 860, 867 (5th Cir. 1995), cert. denied, 116 S. Ct. 825 (1996).

The district court permitted three witnesses, Perez, Agent

Hildreth, and Agent Boyette, to testify over Narviz's hearsay objection concluding the testimony fell within the co-conspirator exception to the hearsay rule. FED. R. EVID. 801(d)(2)(E) states "a statement is not hearsay if. . . the statement is offered against a party and is. . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." For the Rule to apply, the proponent of the testimony must show: 1) the conspiracy existed; 2) the statement was made during the course of and in furtherance of the conspiracy; and 3) the co-conspirator and the defendant are members of the conspiracy. United States v. Asibor, 109 F.3d 1023, 1032 (5th Cir. 1997). The proponent must establish these elements by a preponderance of the evidence. Bourjaily v. United States, 483 U.S. 171, 175 (1987). Further, in the case of a non-testifying con-conspirator, the proponent must adduce independent evidence of a concert of action in which the defendant was a participant. Asibor, 109 F.3d at 1033.

**a. Perez**

Narviz complains Perez made two statements which he argues are objectionable. First, Perez testified that he was arrested in 1987 with 75 pounds of marijuana that a co-conspirator, Tim McCaskill, supplied. When the government asked about the origin of the 75 pounds, Perez testified that it had come from Narviz. Second, Perez testified that he met a pilot who said that he was flying marijuana from Mexico's interior for Narviz. Narviz argues that

9

the government failed to show that either McCaskill or the pilot belonged to the same conspiracy as Narviz. Narviz further objected to Perez's testimony concerning McCaskill on the grounds that Perez had no personal knowledge.[1]

A court may evaluate the testimony itself to determine whether the co-conspirator exception to the hearsay rule has been met. United States v. Burton, 126 F.3d 666, 671 (5th Cir. 1997). Here, we look to Perez's testimony to determine if it falls within the exception. We hold that it does. Perez testified that before his 1987 arrest, he met twice with Narviz in McCaskill's presence to buy marijuana McCaskill was holding for Narviz. Thus, McCaskill and Narviz are members of the same conspiracy[2] and the admitted statements were made in furtherance of that conspiracy.

As for the pilot, we again examine the testimony itself to determine whether it was properly admitted. We conclude that the pilot and Narviz were members of the same conspiracy because the pilot was flying marijuana for Narviz. Moreover, the pilot's statement was made in furtherance of that conspiracy. Thus, the testimony was admissible under FED. R. EVID. 801(d)(2)(E).

### b. Agents Hildreth and Boyette

---

[1]We do not address this objection because the testimony is admissible under the co-conspirator exception to the hearsay rule.

[2]We point out that for the co-conspirator exception to apply, "same conspiracy" does not have to be the same conspiracy as charged n the indictment. United States v. Arce, 997 F.2d 1123, 1128 (5th Cir. 1993).

DEA Agent Hildreth testified that he got a break in his investigation when Tony Hall, who was then an informant, received a call from Perez's wife asking for help. Narviz argues that the co-conspirator exception does not apply because neither Perez's wife nor Hall were co-conspirators. Hall, at the time Perez's wife telephoned, was a cooperating witness, and Perez's wife was never shown to be a member of the conspiracy.

We agree with the government that the testimony is not hearsay. A statement is hearsay only if it is being offered to prove the truth of the matter. FED. R. EVID. 801(c). Here, Agent Hildreth's testimony was not given to show the truth of what Perez's wife said; rather, the purpose of the testimony was to show why Hildreth resumed his investigation. Thus, the court did not abuse its discretion in permitting Hildreth to testify.

Finally, Narviz objects to two allegedly hearsay statements Agent Boyette made. Boyette testified that he told Grant that Customs, during a three year investigation, had received information that Narviz was involved in narcotics smuggling. Boyette also testified that after arresting and debriefing four people, investigators were led to Narviz's ranch. Again, we find that the district court did not abuse its discretion in admitting the testimony. The arrest and debriefing statement, like Hildreth's testimony, is not hearsay because it is not offered to prove the truth of the arrests and debriefings. Instead, the testimony is used to explain why investigators went to Narviz's

11

ranch. As for Boyette's warning to Grant, the testimony was offered to refute Grant's implication at trial that he knew nothing about Narviz's illegal activities. While Boyette's testimony may have been prejudicial[3], Narviz only argues that the testimony was inappropriate because it was hearsay. The testimony is not hearsay because the testimony was offered to show what Grant knew not whether Customs was actually investigating Narviz. Again, the district court did not abuse its discretion in admitting either Hildreth's or Boyette's testimony.

## 5. UNITED STATES SENTENCING GUIDELINES

This Court reviews the district court's factual findings as to the relevant quantity of drugs under the clearly erroneous standard. United States v. Montes, 976 F.2d 235, 240 (5th Cir. 1992).

In making sentencing determinations, a district court may consider a wide range of evidence and must be afforded wide discretion in the sources of information it uses. United States v. Kimbrough, 69 F.3d 723, 734 (5th Cir. 1995). However, the information upon which a judge relies must have "a sufficient indicia of reliability to support its probable accuracy." U.S. SENTENCING GUIDELINES MANUAL §6A1.3(a) (1995). While a PSR generally bears sufficient indicia of reliability, United States v. Alfaro,

_____

[3]We do not address whether the testimony was prejudicial because all issues not briefed are waived. Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir. 1994).

12

919 F.2d 962, 966, "[b]ald, conclusionary statements do not acquire the patina of reliability by mere inclusion in the PSR." United States v. Elwood, 999 F.2d 814, 817-18 (5th Cir. 1993).

Narviz's presentence report ("PSR") holds him responsible for 10,074 kilograms of marijuana. The probation officer states in the PSR that the total is based primarily on information contained in various debriefings, recorded meetings and telephone calls, and on the amount of marijuana seized in the different arrests of the co-conspirators. She further states that "[a]lthough the Government has information from cooperating individuals that the defendant was involved in narcotics trafficking activities. . . over a period. . . of years, this information has not been corroborated with any specificity. Therefore, the defendant is accountable for only those amounts of drugs that have been substantiated[.]" However, as Narviz points out, the debriefings, recorded meetings, and telephone calls upon which the probation officer relied are not attached to the PSR. Nor is there an explanation of how the PSR was corroborated. In short, there is no way for this Court to know whether the PSR contains sufficient indicia of reliability.

We hold, though, that even if the PSR is unreliable, the resulting error is harmless. Assuming arguendo that Narviz's sentence were based only on the amounts proven at trial, his sentence would not change. The PSR holds Narviz responsible for 10,074 kilograms of marijuana, which results in a offense level of 40. See U.S. SENTENCING GUIDELINES MANUAL § 2D1.5 (1995). Narviz

13

concedes that the government proved that he was responsible for 4,802 kilograms at trial. That amount, however, would give him an offense level of 38, which is a two point reduction. Id. What Narviz ignores is that his offense level was raised two points for obstruction of justice. Narviz does not appeal the upward adjustment for obstruction of justice, and all issues not briefed are waived. Cinel, 15 F.3d at 1345. Thus, even with the two point reduction, Narviz's offense level is 40, which would have resulted in a sentence of 292-365 months.[4] See U.S. SENTENCING GUIDELINES MANUAL Ch. 5 Pt. A (1995). Because Narviz's sentence falls within this range, any error resulting from reliance on the PSR is harmless. See United States v. Misher, 99 F.3d 664, 671 (5th Cir. 1996), cert. denied sub nom, Cobb v. United States, 118 S. Ct. 73 (1997).

### 6. FORFEITURE

21 U.S.C. § 853 permits the forfeiture of a person's property if he has been convicted of a federal drug crime which is punishable by more than a year's imprisonment. Here, the jury found Narviz's truck was forfeit because it was "used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, [a drug crime]", 21 U.S.C. § 853(a)(2), and because it afforded Narviz control over a continuing criminal enterprise, 21 U.S.C. § 853(a)(3). On appeal, Narviz only contests the

---

[4]This sentence applies to a defendant with an offense level of 40 and a criminal history that falls within category I.

14

forfeiture under (a)(2).  Because the forfeiture is sufficient under § 853(a)(3), we affirm.

**B. GRANT**

### 1. COMPENSATED WITNESSES

Grant argues that the government's case against him was based largely on three compensated witnesses, who were paid either in terms of travel expenses or in lenient sentence recommendations. As a result, he was entitled to a compensated witness instruction; however, the trial court only generally instructed the jury on the effect of a plea agreement.  Because Grant failed to raise this claim at trial, this Court reviews for plain error.  United States v. Lopez, 923 F.2d 47, 49 (5th Cir. 1991).

For a compensated witness' testimony to be admissible, it must meet four requirements:  1) the government may not encourage or deliberately use perjured testimony; 2) the government must completely and timely disclose to the accused the fee arrangement it made with the informant; 3) the accused must have an adequate opportunity to cross-examine the informant and government agents about any compensation agreement; and 4) the trial court must give a careful instruction to the jury pointing out the compensated witness' suspect credibility.  United States v. Rizk, 833 F.2d 523, 525 (5th Cir. 1987).

While the judge did not give an instruction pointing out the witnesses' suspect credibility, he did instruct the jury to

carefully, cautiously weigh the testimony of those who have entered into a plea agreement.[5]  It is up to the jury to evaluate the credibility of compensated witnesses, United States v. Garcia Abrego, 141 F.3d 142, 151 (5th Cir. 1998), and the judge's instruction allowed the jury to do so.  Any error, then, in failing to give a specific instruction does not rise to the level of plain error.

### 2. SPEEDY TRIAL ACT

This Court reviews the factual findings supporting a Speedy Trial Act ruling for clear error and the legal conclusions de novo. United States v. Grosz, 76 F.3d 1318, 1323 (5th Cir.), cert. denied, 117 S. Ct. 167 (1996); United States v. Tannehill, 49 F.3d 1049, 1051 (5th Cir.), cert. denied, 116 S. Ct. 167 (1995).

Under the Speedy Trial Act ("the Act"), a defendant must be tried within seventy days of indictment or of the day the defendant first appears before the judge or magistrate, whichever is later. 18 U.S.C. § 3161(c)(1).  If more than seventy days pass, the indictment is dismissed upon the defendant's motion.  18 U.S.C. § 3162(a)(2).  Delay resulting from any pretrial motion through the conclusion of the hearing or other prompt disposition of the motion is excluded from calculation.  18 U.S.C. § 3161(h)(1)(F).  All the

---

[5]The judge instructed that "[t]he testimony of one who provides evidence against a defendant as an informer pursuant to the terms of a plea agreement, or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses."

16

time between filing the motion and concluding the hearing is excluded whether or not a delay in holding the hearing is reasonably necessary. Henderson v. United States, 476 U.S. 321, 330 (1986).

Grant argues that ninety non-excludable days elapsed between the time he was indicted (December 5, 1995) and the time he moved to dismiss the indictment pursuant to the Act (November 26, 1996). Thus, the trial court should have dismissed his indictment. We disagree.

As stated above, the Act begins counting seventy non-excludable days from the day of indictment or the day the defendant first appears in court, whichever is later. While Grant was indicted December 5, 1995, he did not make his first appearance until January 5, 1996. Because his first appearance was later than the indictment, Grant's calculation includes more than twenty improperly counted days. Thus, fewer than seventy excludable days elapsed.

### 3. INSUFFICIENT EVIDENCE

Grant argues that he was improperly convicted of money laundering. For the government to convict him, it must prove that he transferred money to or from the United States with the intent of promoting or carrying on of marijuana distribution. See 18 U.S.C. § 1956(a)(2). He concedes that he asked another to transfer money from Mexico to the U.S. to pay for the ranch; however, he

contends that there is insufficient evidence showing that he knew that ranch was being used for illegal activity.

This Court reviews the evidence in the light most favorable to, and with all reasonable inferences drawn in support of, the verdict. United States v. Thompson, 130 F.3d 676, 688 (5th Cir. 1997). We must affirm Grant's conviction under these counts if any rational trier of fact could have found the essential elements beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Because Grant admits that he directed ranch payments to be transferred from Mexico to the U.S., the only question is whether there is sufficient evidence to show that Grant knew of the ranch's illegal purpose. He contends that the evidence is insufficient. Six months after Grant became ranch foreman in 1991, he was kicked off because the buyer[6] had not made regular payments. He did not return until early 1993. Moreover, the first direct event linking the ranch to marijuana distribution occurred in October 1994[7] after Grant ceased to be foreman.

Grant's argument fails because he does not point this Court to

---

[6]The government alleges that Narviz used a straw man, Francisco Garcia, to purchase the ranch. The evidence showed, though, that Narviz made the payments.

[7]In October 1994, an potential buyer unexpectedly stopped by the ranch. He testified that he could smell marijuana and that he observed eight Hispanic men with backpacks and bedding in the ranch house.

any evidence which would contradict the government's evidence that he was connected with marijuana distribution. For instance, while Grant claims he was not the foreman in October 1994, he fails to substantiate his argument with evidence in the record. Nor does he point this Court to any evidence that would show that his sole capacity at the ranch was foreman. On the other hand, the government's evidence shows that six months after Grant became foreman, all the cattle were gone and the trees showed signs of neglect. Further, routine oil changes had not been done on the equipment, and fences had deteriorated or been removed altogether. Twenty months after Grant returned, the ranch still had no pecans or cattle, and the stock pens, irrigation ditches, and two houses were neglected.

The government also presented evidence that David Powell, a co-conspirator, had picked up a marijuana load at the ranch for Juan Martinez. Moreover, when Grant's house was searched after his arrest, agents found an envelope with the name "Juan Martinez" penciled on it. While this evidence is thin, we review in the light most favorable to the verdict. We cannot say that a rational trier of fact could not have found beyond a reasonable doubt that Grant laundered money.

### 4. UNITED STATES SENTENCING GUIDELINES

The district court's finding of fact are reviewed for clear error, and its application of those facts to the guidelines are

19

reviewed <u>de</u> <u>novo</u>.  <u>United States v. Moore</u>, 997 F.2d 55, 60 (5th Cir. 1993).  Under the sentencing guidelines, a defendant is accountable for all relevant conduct including the foreseeable acts of his co-conspirators.  <u>United States v. Sotelo</u>, 97 F.3d 782, 799 (5th Cir. 1996); UNITED STATES SENTENCING GUIDELINES MANUAL § 1B1.3(a)(1)(B).  In attributing the acts of co-conspirators to a particular defendant, those acts must be reasonably foreseeable and within the scope of the criminal activity.  <u>United States v. Smith</u>, 13 F.3d 860, 867 (5th Cir. 1994).

Grant argues that the 9,028 kilograms attributed to him were not reasonably foreseeable.  He contends that there was no evidence that he was involved in the drug conspiracy from 1991-94.  Rather, he claims involvement beginning in September 1995.  Because 400 pounds were delivered between September and November 1995, he claims responsibility only for that amount.

Grant's argument here is similar to his insufficiency of the evidence argument.  Again, he fails to present any evidence to support his argument that he was not involved from 1991-94. However, we do have evidence before us that while Grant was foreman the ranch was severely neglected.  Further, the government presented evidence that in October 1994, a potential buyer, who had contracted to purchase the ranch, made an unexpected visit.  The visit made him suspicious that illegal drug activity was occurring at the ranch.  When he reported these suspicions, Grant replied that he "would see about it".  Grant, however, sued to void the

20

sale contract with the buyer and to bar him from the ranch. With this evidence before us, and with nothing to contradict it, we hold that the 9,028 kilograms of marijuana was foreseeable and thus, affirm Grant's sentence.

## CONCLUSION

For the foregoing reasons, we VACATE Narviz' CONVICTION on count one. Otherwise, we AFFIRM Narviz's CONVICTIONS on the remaining counts and his SENTENCE. As for Grant, we AFFIRM both his CONVICTIONS and SENTENCE.